IN THE UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION


IN RE:                        * Chapter 11
                              *
COLONY LODGING, INC.          * Case No. 10-60909
MONTE NIDO ESTATES, LLC       * Case No. 10-60920
ROSSCO HOLDINGS, INC.         * Case No. 10-60953
WM PROPERTIES, LTD.           * Case No. 10-60918
                              *
     Debtor.                  * October 12, 2010



----------------------------------------------------

   HEARING BEFORE THE HONORABLE CRAIG A. GARGOTTA

               BANKRUPTCY JUDGE

----------------------------------------------------


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1                A P P E A R A N C E S
 2    WINSTON & STRAWN, LLP
      By:  Mr. David L. Aronoff
 3    333 South Grand Avenue
      Los Angeles, California  90071
 4    Appearing for Pacific Mercantile Bank;
 5    WINSTON & STRAWN, LLP
      By:  Mr. Steven D. Atlee
 6    333 South Grand Avenue
      Los Angeles, California  90071
 7    Appearing for Pacific Mercantile Bank;
 8    ANDREWS KURTH
      By:  Ms. Monica S. Blacker
 9    1717 Main Street, Suite 3700
      Dallas, Texas  75201
10    Appearing for OneWest Bank;
11    OFFICE OF THE UNITED STATES TRUSTEE
      By:  Mr. Henry G. Hobbs, Jr.
12    903 San Jacinto, Suite 230
      Austin, Texas  78701
13    Appearing for the United States Trustee;
14    BEARD KULTGEN BROPHY BOSTWICK DICKSON & SQUIRES, LLP
      By:  Mr. Larry E. Kelly
15    5400 Bosque Boulevard
      Central Tower, Suite 301
16    Waco, Texas  76710
      Appearing for Leonard Ross;
17
      KELLY HART & HALLMAN, LLP
18    By:  Mr. Michael A. McConnell
      201 Main Street, Suite 2500
19    Fort Worth, Texas  76102
      Appearing for the Debtor;
20
      WINSTON & STRAWN, LLP
21    By:  Mr. Justin E. Rawlins
      333 South Grand Avenue
22    Los Angeles, California  90071
      Appearing for Pacific Mercantile Bank;
23
      LOCKE LORD BISSELL & LIDDELL, LLP
24    By:  Mr. Travis Lee Richins
      2200 Ross Avenue, Suite 2200
25    Dallas, Texas  75201
      Appearing for National Guardian Life Insurance Company;
```

1    WINSTON & STRAWN, LLP
     By:  Mr. Saul S. Rostamian
2    333 South Grand Avenue
     Los Angeles, California  90071
3    Appearing for Pacific Mercantile Bank;

4    MUNSCH HARDT KOPF AND HARR, P.C.
     By:  Ms. Patricia B. Tomasco
5    401 Congress Avenue, Suite 3050
     Austin, Texas  78701
6    Appearing for Pacific Mercantile Bank;

7    OFFICE OF THE UNITED STATES TRUSTEE
     By:  Ms. Valerie Wenger
8    903 San Jacinto, Suite 230
     Austin, Texas  78701
9    Appearing for the United States Trustee.

10
                    * * * * * * * * * * * *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    COURTROOM DEPUTY:  All rise.

2    THE COURT:  Good morning, ladies and

3  gentlemen.  Please be seated.

4    All right.  We've got -- I apologize.  This is

5  normally not my courtroom, but Judge Mott is hearing

6  the Chapter 13 docket today, so that's why we're in

7  here.

8    All right.  We have a number of matters set on

9  our docket this morning.  Bear with me for one minute,

10  please.  Let's see, we've got -- I'm going to just

11  read them all off, and then I'll take announcements.

12    The first matter that we've got is Case Number

13  10-60909, Colony Lodging, Inc.  The second matter is

14  Case Number 10-60918, WM Properties, Limited.  The

15  next matter is Case Number 10-60920, Monte Nido

16  Estates, LLC.  The next matter is Case Number

17  10-60953, Rossco Holdings, Inc.  And that's all of

18  them.

19    So, may I have announcements, please.

20    MS. WENGER:  Valerie Wenger for the United

21  States Trustee.

22    MS. TOMASCO:  Your Honor, Patty Tomasco on

23  behalf of Pacific Mercantile Bank.  I'm local counsel

24  for Winston & Strawn; that's Steve Atlee, David

25  Aronoff, Justin Rawlins and Saul -- yeah -- Rostamian.

1      THE COURT:  Okay.  I don't know if I got
2  all those names, but I did get yours.
3      MS. TOMASCO:  I believe that Mr. -- I
4  believe that Mr. Atlee and Mr. Rawlins will be having
5  the speaking roles today.
6      THE COURT:  All right.  Thank you.
7      MR. KELLY:  Good morning, your Honor.
8  Larry Kelly.  I'm here for Mr. Leonard Ross.
9      MR. McCONNELL:  Good morning, your Honor.
10  Michael McConnell.  I'm here on behalf of the four
11  Debtor estates.
12      MR. RICHINS:  Good morning, your Honor.
13  Travis Richins for National Guardian Life Insurance
14  Company.  We're a claimant in the Rossco Holdings
15  case.  We're also a creditor in two related cases that
16  are not on the docket today, --
17      THE COURT:  All right.  Thank you.
18      MR. RICHINS:  -- Rossco Plaza and LJR.
19      THE COURT:  Okay.  Thank you.
20      MR. HOBBS:  Just in case Ms. Wenger let's
21  me speak, Henry Hobbs for the U.S. Trustee.
22      THE COURT:  She probably won't, but
23  nonetheless...
24      Okay.  Well, what we had set on the docket today
25  was motions to appoint trustee filed by PMB, otherwise

1    known as Pacific Mercantile Bank Corp.  I understand,

2    in the interim, starting with Friday, we've had a

3    flurry of activity in this case, including a motion to

4    transfer venue that I think was filed on Thursday,

5    some responses and pleadings going back.

6        We've also had a motion for continuance filed.

7    I believe -- Was it filed by the Debtors?

8            MR. McCONNELL:  That's correct, your Honor.

9            THE COURT:  All right.  So, what do I do for

10   purposes of this morning?  As I understand it, on the

11   motion to transfer venue, the Movant on the motion to

12   appoint trustee does not oppose the motion to transfer

13   venue at this point.  Is that correct?

14           MR. McCONNELL:  Well, let me see if I can

15   straighten this out.

16           THE COURT:  Please.

17           MR. McCONNELL:  Your Honor, the --

18           THE COURT:  Oh, hang on a second.

19       Do we -- I'm sorry, Mr. McConnell.

20       Do we have anybody on the phone?  Is there anyone

21   on the phone?

22           MS. BLACKER:  Yes, your Honor.  Monica

23   Blacker, of Andrews Kurth, on behalf of OneWest Bank.

24   We're -- We're a creditor in two of the pieces.

25           THE COURT:  All right.  I'm -- Can you turn

October 12, 2010

1   that up a little bit, Ms. Lopez?  I didn't hear

2   counsel's name.  Let's try that again, please.

3       Could you state your name again, please?

4           MS. BLACKER:  Sure, your Honor.  It's Monica

5   Blacker, B-L-A-C-K-E-R, from Andrews Kurth, on behalf

6   of OneWest Bank.

7           THE COURT:  Okay.  Anyone else?

8           (No audible response.)

9           THE COURT:  All right.  Thank you.

10      All right, Mr. McConnell.  Go ahead.

11          MR. McCONNELL:  Yes, your Honor.

12      Pacific Mercantile Bank, a creditor in the four

13  cases that are subject to this -- today's proceedings,

14  filed motions to appoint Chapter 11 trustees, or, in

15  the alternative, a Chapter 11 examiner, in all four

16  cases, on I believe it was September the 30th.

17          THE COURT:  Right.

18          MR. McCONNELL:  Last Thursday, Pacific

19  Mercantile Bank filed a motion to transfer the venue

20  of these four cases to California to be consolidated

21  with the individual Chapter 11 case of Mr. Leonard

22  Ross, the principal of these Debtors.

23          THE COURT:  Right.  He filed -- His filing

24  predated these cases; is that correct?

25          MR. McCONNELL:  No.

1          THE COURT:  All right.

2          MR. McCONNELL:  It was after these cases

3    were initiated.

4          THE COURT:  Go ahead.

5          MR. McCONNELL:  So, on Friday we filed a

6    motion -- a joinder to the motions to transfer venue,

7    agreeing with Pacific Mercantile Bank that, in the

8    administration of justice and for the efficiency of

9    justice and the interests of the parties, that these

10   cases should, indeed, be transferred to California to

11   be consolidated with Mr. Ross's individual case.  And

12   we promptly filed a motion to continue these hearings

13   so that these cases, when transferred, the motions to

14   appoint trustee can be heard by the California judge,

15   the same judge that is being faced with the motion to

16   appoint trustee in Mr. Ross's individual case.

17        So, in terms of today's proceedings, we believe

18   that this can either be a very short proceeding or a

19   very long proceeding.  If the Court should deny the

20   motion to continue, then we are prepared to defend the

21   motion to appoint a trustee.

22          THE COURT:  All right.

23          MR. McCONNELL:  At whatever appropriate

24   point, my colleague, Mr. Kelly, would like to address

25   the merits of the motion, if you wanted that now or

1    later.

2              THE COURT:  The merits of which motion?

3              MR. McCONNELL:  Both.

4              THE COURT:  All right.  Well, I'll be happy

5    to hear on the motion to continue right now.  Let's

6    deal with that first.

7              MR. KELLY:  Good morning, your Honor.

8              THE COURT:  Good morning.

9              MR. KELLY:  Very briefly, let me do this in

10   kind of -- this part.

11       Mr. Ross is from California, so it made me think

12   of movies.  This is sort of a three-part movie.  It

13   started out as -- And this does relate to the

14   continuance.

15             THE COURT:  Okay.

16             MR. KELLY:  The -- It's the Princess Bride

17   movie.  And all of these are facts from the pleadings

18   in the court, pleadings or the record.  In the Colony

19   Lodging case, there's a motion for relief from stay,

20   so I'm taking most of these cites right now from that

21   pleading.  This -- The loan was made --

22             THE COURT:  Excuse me, Mr. Kelly.  Who filed

23   the motion for relief from stay?

24             MR. KELLY:  That was filed by this bank, --

25             THE COURT:  All right.

1        MR. KELLY:  -- PMB Bank.

2        The -- In that motion, they point out that the

3   loan at issue in Colony Lodging was made in January of

4   2009.  In June of 2010, it was three months behind.

5   They're -- This is what I call the Princess Bride

6   stage.  When they made the loan, everybody was happy,

7   and signed loans and passed money.

8        At some point, that loan got in default.

9   According to that pleading, it shows that in June of

10  2010 it was three months in arrears.  If you count

11  that up, that means there were seventeen payments due;

12  fourteen had been made.  At that point, they went into

13  an aggressive stage.  I call this the Chicken Little

14  stage.  The sky is falling; oh, my Lord, we need help.

15  According to that pleading, it shows that in state

16  court, PMB--I call them PMB; I'm sorry--the bank

17  filed a motion for TRO.  They filed for a motion for

18  appointment of a receiver.  And they also filed -- or

19  posted the property for foreclosure.  That led to the

20  bankruptcy of all of these cases.

21       Postpetition, Chicken Little continues.  And

22  every one of these cases were emergency motions for --

23  to disallow the use of cash collateral.  There was a

24  motion for relief from stay in the Colony

25  Apartments -- Colony Lodging case, and there was an

1  expedited Rule 2004 requested.  There was an interim

2  hearing; there were final hearings.  Final hearings

3  were before Judge King in San Antonio.  In the

4  meantime, this is Mr. Ross's third trip here from

5  California in about six weeks, all because of these

6  pleadings.

7      At that hearing, the lift stay was denied, the

8  cash collateral was permitted on a budget that the

9  parties in --

10      UNIDENTIFIED SPEAKER:  The lift stay was

11  never -- it was never denied.  We withdrew the lift

12  stay motion, based upon Ross's providing proof of

13  insurance, because the Colony Lodging property was not

14  insured.

15      MR. KELLY:  I apologize.  I will --

16      UNIDENTIFIED SPEAKER:  You know, I don't

17  want to get these facts -- The facts are starting to

18  get...

19      THE COURT:  All right.  Is that correct,

20  Mr. Kelly, that --

21      MR. KELLY:  That is correct.  However, after

22  he came -- after we agreed to do that, and after he

23  was required to show up from California, and after we

24  were required to drive to San Antone, and after we

25  were required to appear before the Court, yes, they

1    withdrew it.  Okay?

2         Then there was the Rule 2004.  And that's been

3    pulled?

4              MS. TOMASCO:  No.  It's --

5              MR. KELLY:  Denied?

6              MS. TOMASCO:  No.  It's been --

7              UNIDENTIFIED SPEAKER:  The 2004 exams were

8    granted (inaudible).

9              MS. TOMASCO:  Granted.

10             MR. KELLY:  Okay.  Now you come into the

11   current stage.  In late September, we announced --

12   There was a notice on the Court's bulletin board that

13   we have a new judge appointed for Waco.  All of these

14   hearings were before Judge King.

15             THE COURT:  Right.

16             MR. KELLY:  September 29th, these

17   announcements were made to the court.  I'm looking to

18   see if there's any disagreement.

19             THE COURT:  You mean, to Judge King?

20             MR. KELLY:  Judge King.  I apologize.

21             THE COURT:  Sure.

22             MR. KELLY:  And on the very next day, we

23   go into the Casa Blanca mode, which is the current

24   emergency pleadings filed by this bank.  Okay?

25   They've asked to appoint a trustee in four cases.

1     Just briefly, the court record will show,

2  Monte Nido, which is property outside of

3  Santa Barbara, very valuable, very expensive property;

4  I think the debt's roughly $9 million on that

5  property.  It's above land; it's unimproved; it's

6  dirt.  I don't know why we would need a trustee on the

7  Monte Nido Estates.  The property in Killeen is a

8  commercial lease.  I don't know why we need a trustee

9  on the commercial lease.  The Rossco properties, I

10  don't understand.

11     The only property that they would argue they need

12  is the property, Colony Lodging.  From their

13  pleadings, there's an emergency motion for the

14  appointment of a trustee:  My Lord, we've got to have

15  it today; we've had all these other hearings, but

16  we've got to have it today.  Why?  Because we've

17  learned -- we've learned, that pleading says, that

18  Mr. Ross has filed a Chapter 11, personally, and has

19  been gambling postpetition with funds.

20     Subsequent to that, when they were advised that

21  was incorrect, they filed a Supplemental Pleading

22  Number 1.  Subsequent to that, they filed Supplemental

23  Pleading Number 3.  Then they file a motion to

24  transfer venue to California.

25     All right.  Let's just go to the argument.

1    THE COURT:  Maybe they found out I was the

2  judge and they weren't happy about that, and they

3  wanted to go to California.

4    MR. KELLY:  I would go on the record and say

5  I doubt that that's accurate, your Honor.  I'm sure

6  they're pleased with the Court.

7    THE COURT:  I'm just pulling your leg

8  a little bit, Mr. Kelly.  Go ahead.

9    MR. KELLY:  Thank you.

10    They filed a motion to transfer venue.  As the

11  Court knows, under 1104, the Court no longer -- unlike

12  the old days, no longer appoints a trustee.  The Court

13  orders the appointment of a trustee.  So, the pleading

14  here today is not to appoint a trustee, it's to order

15  the appointment.  That order would go to the Office of

16  the U.S. Trustee.  And under the Code -- They know

17  their job better than anybody, but they're going to

18  have to get input.  They have 30 days.  They would

19  appoint a trustee.  It's Section 1104 of the Code.

20    In the meantime, the same Movants are asking to

21  send these cases to California.  Okay?  So, what they

22  want you to do is order appointment of a trustee, and

23  then send this to California.  I'm going to assume, to

24  be honest, that they don't really want Mr. Hobbs and

25  his staff to appoint a trustee in Austin and then tell

1  the judge, Judge Zurzolo -- Vince Zurzolo's the judge
2  in Los Angeles that has the individual case.  And
3  under their rules, these would be consolidated.  And
4  my belief is, he would end up as the base judge for
5  all of these cases.  I'm sure they don't want to send
6  it out there with a trustee already appointed.  They
7  might.  But what they want you to do is enter an order
8  and tell that judge he has to order the U.S. Trustee
9  to appoint a trustee.

10      Now, that costs money.  Trustees cost a fortune.
11  I don't need to tell the Court what the state of the
12  law is in Texas, but this is an emergency hearing.
13  It's akin to a TRO.  It's clear and convincing
14  evidence.  They know what -- My opinion is, from their
15  pleadings, supplemental pleadings, they no longer are
16  arguing that funds were used by Mr. Ross postpetition
17  from his estate, at all.  They're now back to, we just
18  think he's incompetent in general.  So, you're going
19  to have to hear evidence on all of the administration.

20      I can tell the Court, in my opinion, they're not
21  going -- there's not going to be a trustee appointed.

22      What I would like your Honor to do is grant the
23  continuance because of the motion to transfer venue,
24  which we will agree to.  This will be in California
25  quickly.  It can be heard in California.  If they have

1   a reason that the sky is going to fall tomorrow, this
2   afternoon, next Thursday, then that's what we should
3   be ordered to concentrate on today.  Otherwise, you
4   should grant the continuance and transfer the case.
5          If we have to try it, I would like to
6   respectfully request the right, at the end of the
7   conclusion of the hearing, when the Court rules, to
8   have the right to withdraw our request to transfer --
9   our consent to transfer venue.  Why?  Venue -- This
10  case was filed here; nobody objected.  341s were
11  scheduled; nobody objected.  All their pleadings were
12  filed, interim orders were entered, final hearings
13  were held in San Antone; nobody objected.  New judge
14  appointed, new emergencies filed; nobody objected to
15  venue.
16         Suddenly, two months into the case, they want to
17  transfer venue.  I would like the ability to argue
18  it's been waived, should the Court deny appointment
19  of the -- deny the continuance and then, ultimately,
20  deny appointment of a trustee.
21             THE COURT:  All right.  Thank you,
22  Mr. Kelly.
23         Before I let you respond, does counsel from
24  Andrews Kurth have a position on the motion to
25  continue?

October 12, 2010

1          MS. BLACKER:  No, your Honor.

2          THE COURT:  All right.  You don't, one way

3     or the other?

4          MS. BLACKER:  No.

5          THE COURT:  All right.  Now, -- All right.

6     Go ahead, sir.  And announce your name for the record,

7     please.

8          THE COURT:  Thank you, your Honor.  Steven

9     Atlee on behalf of Pacific Mercantile Bank.

10         With regard -- Taking the motion to continue

11    first, your Honor.

12         THE COURT:  Yeah.  Let's deal with that.

13         MR. ATLEE:  We did file an opposition to it

14    on Friday.  I know there was a flurry of filings.  But

15    the point made in that opposition is, the only reason

16    given to continue our arguments relating to judicial

17    economy, we submit that that is a less compelling

18    interest than protecting the Debtor's estates and

19    dealing with the serious issues that are raised in the

20    trustee motion.

21         THE COURT:  What about Mr. Kelly's point?

22    I mean, I'm sorry, I'm a little -- I have to tell you,

23    I'm a little bit confused by this.  Not confused that

24    I don't understand what's going on, but confused why

25    you -- We set this on an emergency basis, but as

1  I recall, we set it ten or eleven days ago.  So, this

2  has been pending a while.  We just didn't say, the

3  next day, let's have the hearing on the motion to

4  appoint a trustee, which, to my way of thinking, is a

5  fairly significant event in the case.

6      And then on the eve of the hearing, you move to

7  transfer venue.  So, why shouldn't that be the

8  operative pleading I should consider first?

9          MR. ATLEE:  Well, because that would be the

10 tail wagging the dog, your Honor.

11         THE COURT:  Why?

12         MR. ATLEE:  In terms of the serious issues

13 that are raised in the trustee motion.  The venue

14 motion relates to the convenience of the parties.

15 Now, you know, whether we all think that it would be

16 more convenient to litigate in California as opposed

17 to Texas, so be it.  It seems like we're all in

18 agreement on that.  But that's --

19         THE COURT:  So, why shouldn't I transfer --

20 Why shouldn't I accept your suggestion and transfer

21 the case, but not appoint a trustee?  It seems

22 silly --

23         MR. ATLEE:  The -- The --

24         THE COURT:  If I may, it seems silly for

25 me to make Mr. Hobbs go and do his duty, appoint a

1  trustee, and then transfer the case, because then

2  they're going to have to appoint a new trustee in

3  California.

4         MR. ATLEE:  It's not silly, your Honor,

5  because whoever the trustee is that's appointed, it's

6  going to be somebody who has expertise to deal with

7  properties in both Texas and in California.

8         THE COURT:  Okay.

9         MR. ATLEE:  Okay?  It's also not silly

10 because we need this, really, now.  This -- This --

11        THE COURT:  What are we -- What are we

12 concerned about immediately?  What are we concerned

13 about that -- what Mr. Ross is going to do that really

14 concerns you in the interim that I can't just hold off

15 on this and decide whether or not to transfer venue?

16        MR. ATLEE:  Well, by his own admission, in

17 the declarations that he's filed, he has gambled half

18 a million dollars in a -- looks like a one-day period.

19        THE COURT:  Is this of his personal funds or

20 funds of the Debtor?

21        MS. TOMASCO:  We don't know.

22        MR. ATLEE:  We don't know.

23        THE COURT:  Okay.

24        MR. ATLEE:  Because we have very incomplete

25 schedules, schedules which were filed two and a half

October 12, 2010

Page 20

1 months ago.  At the meeting of creditors, it was
2 completely obvious that they were inaccurate and
3 needed to be amended.  He is the ultimate owner of
4 Rossco Holdings, which owns Colony Lodging.  So, all
5 of the money that is missing from Colony, we don't
6 know where it went.  There are key questions in the
7 schedules that he has -- he didn't answer in the first
8 instance and continues not to answer.
9         THE COURT:  What about, Mr. Atlee, the
10 discussion on the record:  Is there or is there not a
11 2004 exam scheduled?
12         MR. ATLEE:  There's one scheduled for
13 Mr. Ross.  I believe it's before December 15th.
14         THE COURT:  December?
15         MR. ATLEE:  Correct.  We were pushing --
16 At --
17         THE COURT:  Well, hold on.  Hold on.
18     Now, I'm new to this game, and maybe I'm asking
19 some silly questions.  But if you're concerned about
20 the conduct of Mr. Ross, why is the 2004 scheduled in
21 December?
22         MR. ATLEE:  At the hearing on the -- on the
23 29th of September, we were pushing for an early 2004
24 exam.  They moved to quash.  Mr. Ross got up and
25 testified why it would take him that long to get

Federal Court Reporters of San Antonio, Inc.
210-340-6464

1  prepared to sit for them, in terms of collecting

2  documents.  Basically, he argued that he was in such

3  disarray that he couldn't do it before then.

4         THE COURT:  All right.  Now -- And, so,

5  Judge King ruled and said December 15th, and you did

6  that by agreement?

7         MR. ATLEE:  Judge King ruled, and that

8  was -- you know, we accepted his ruling, but it's

9  continuing to frustrate the flow of any real

10  information.  There's no transparency in terms of

11  where this money is coming from.

12         THE COURT:  All right.

13         MR. ATLEE:  And, fundamentally, I would

14  submit that if Mr. Ross is in a casino, whether it's

15  on August 2nd or in September, or whatever, he's

16  signing hundreds of thousands of dollars worth of

17  markers.  It's not clear.  We've asked him.  He's --

18  He's -- He's not told us that he -- you know, what

19  accounts he had submitted in his credit application to

20  Caesar's.  He's not ever told us that there was enough

21  money in those accounts.

22     It -- It would appear to me that he is out of

23  control.  And that's a situation that is emergent, and

24  we are -- that's the emergency that we are dealing

25  with.

1    THE COURT:  All right.

2    MR. ATLEE:  Just -- I would also just tell

3  the Court, we first learned about this gambling

4  situation on the afternoon of September 29th.  So...

5    THE COURT:  No, I recognize that.

6    MR. ATLEE:  We weren't able to bring this to

7  the attention of Judge King at the time.  I have a

8  feeling that we would be in a much different place had

9  that happened.

10    THE COURT:  You all can't control the fact

11  that we've added a new judge and I picked up Waco.

12  I recognize that.  That's beyond your control.  That's

13  just how we worked things out.  So, you're stuck with

14  me, at least for the interim.

15    MR. ATLEE:  We're happy to have you, your

16  Honor.

17    THE COURT:  All right.

18    MR. ATLEE:  And with regard to the motion to

19  transfer venue, again, in the grand scheme of things,

20  would we be -- would it be easier for us in

21  California?  Yes.  But that should not become the

22  reason for Mr. Ross and the Debtors to not deal with

23  the trustee motion today.  They -- They're all too

24  happy to push it off, but -- but that is the issue for

25  today.

1      THE COURT:  Well, we've got a lot of smart

2  people in this courtroom.  Can't we come up with -- If

3  your concern is about dissipation of assets, or

4  dissipation of money of the estate, can't we work

5  something out in the interim until the issue of

6  appointment of trustee comes before either me or the

7  judge in California?

8      MR. ATLEE:  Well, I think the issue of

9  appointment of trustee is before you today.  That's

10 what we seek.

11     THE COURT:  But let's assume that I'm

12 persuaded -- Let's just, for discussion purposes,

13 because Mr. Kelly's going to have to address this, but

14 let's say that I think, really, the way to deal with

15 this is for me to transfer the case, but put in some

16 interim relief so that, if you really think Mr. Ross

17 is committing a lot of wrongdoing, we place some

18 controls on him so he can't do that, as sort of a

19 mechanism, if you will, to address your concerns in

20 the interim.

21     MR. ATLEE:  We don't have accurate

22 schedules.  We don't have a 2004 for another couple of

23 months.  There's no transparency in terms of where

24 this money is going.

25     THE COURT:  Okay.  And I understand you're

October 12, 2010

Page 24

1   concerned.  It's just, I'm trying to think, surely we
2   should be able to come up...
3       What is it that you want Mr. Ross not to do?
4   Let's assume, if I said to you, all right, Mr. Atlee,
5   I'm of the opinion that really what I ought to do is
6   transfer venue, and I'm not going to appoint a trustee
7   at this point.  And then I said to you, what is it you
8   don't want Mr. Ross to do in the interim, what would
9   your answer be?
10          MR. ATLEE:  To continue to conceal and
11  not -- not report.  He needs to tell us -- He needs
12  to -- to correct schedules immediately.  He needs to
13  submit to a 2004 so that we can explore the -- the
14  gambling, transfers between the Debtors and Mr. Ross
15  and the Ross trusts.  He basically -- You know, from
16  the information that we have now, he's not a man who
17  is acting responsively -- responsibly or -- or under
18  control.  You don't lose half a million dollars in
19  a day in a casino and then come to bankruptcy court
20  and say that you're the person who should be in charge
21  of the Debtors.
22          THE COURT:  All right.  All right.  You'll
23  get another shot.  I appreciate it.
24      Before I hear from you, Mr. Kelly, does
25  Ms. Wenger or Mr. Hobbs want to say anything?  Because

Federal Court Reporters of San Antonio, Inc.
210-340-6464

1  this somewhat implicates you in terms of the exercise

2  of your duties with regard to appointment of trustee.

3          MS. WENGER:  It does, indeed, your Honor.

4  Valerie Wenger for the U.S. Trustee.

5      With respect to two of these cases, I don't think

6  a trustee is warranted.

7          THE COURT:  Which two are those?

8          MS. WENGER:  The WM Properties case, and

9  then the Monte Nido Estates case.

10          THE COURT:  Because why?

11          MS. WENGER:  Well, normally I would say, in

12  the Monte Nido -- Monte Nido Estates case, the land's

13  not going anywhere.  But since this land is in

14  California and it's probably near a fault line, it

15  might be going somewhere.

16          THE COURT:  Fair enough.

17          MS. WENGER:  But a trustee's not going to be

18  able to do anything about an act of God.

19      Secondly, with WM Properties, it has a building

20  in Killeen.  It's -- A small portion of it is being

21  rented out.  So, to the extent there would be any

22  money flowing upstream and not going to the creditors,

23  it would be a very small -- small amount.

24      The Colony Lodging case is the most problematic,

25  an apartment complex in College Station.  But

1  according to the schedules, the books and records are

2  all in California, so a trustee's going to have to be

3  willing to go back and forth between the two.

4          THE COURT:  Okay.  And then Rossco Holdings

5  is what?

6          MS. WENGER:  It's primarily a holding

7  company, your Honor.

8          THE COURT:  That's what I thought.  So, with

9  re- --

10          MS. WENGER:  I'm just going to let Mr. Hobbs

11  speak.

12          THE COURT:  Okay.  Now, my question was

13  going to be--and I think Mr. Hobbs will address

14  this--I need some guidance, to the extent you want to

15  put it on the record.  Is my sense correct?  Why

16  should I go through the exercise of appointing a

17  trustee here if the case is going to be transferred to

18  California?

19          MR. HOBBS:  Your Honor, I'm not sure that we

20  can -- we can answer that question.  There are,

21  obviously, practicalities that have to be weighed with

22  respect to what the parties can prove with respect to

23  a burden of proof, --

24          THE COURT:  Right.

25          MR. HOBBS:  -- and under 1104, whether a

1  trustee ought to be appointed or not.

2      The practicalities are -- Well, first of all, let

3  me say, the U.S. Trustee can do whatever we need to

4  do, whatever you order.  If you direct us to appoint a

5  trustee, we can coordinate with the office in

6  California, see who a viable candidate might be from

7  that jurisdiction, who might ultimately end up with

8  it.  It is a bit of a chicken-and-egg problem, because

9  normally, if the Court ordered the appointment of a

10  trustee, we would look at least somewhat locally in

11  the State of Texas for someone to do that, even if

12  the -- even if the case was going to be transferred to

13  California.

14      But if it's going to be transferred to

15  California, then we might speak to our colleagues in

16  California to see who would be a viable candidate, who

17  would be dealing with that court out there.  Then they

18  would have to coordinate on-site management, if that's

19  necessary, with respect to at least one of the Debtors

20  where the property is operating, with respect to an

21  apartment complex.

22      Obviously, those aren't impossible things to do,

23  and we can accomplish those.  As a matter of

24  practicality and cost, those are legitimate

25  considerations that I think the parties will argue to

1    you.  Of course, we will do whatever we need to do,

2    and whatever you order us to do, we'll figure out a

3    way to do it.  From -- But from a practical

4    standpoint, I think the Court is going to have to

5    weigh, you know, the chicken-and-egg issue.  I think

6    the parties have a bigger stake in that.  We'll do

7    what you order us to do, and we'll do the best job

8    that we can in balancing those things.

9         But, certainly, a trustee costs money.  And in a

10   case that involves California and Texas, there's going

11   to have to be at least some understanding from the

12   moving parties, if they want a trustee, how that's

13   going to be funded in the case going forward, whether

14   it's -- the bankruptcy court here in Texas hears it or

15   the bankruptcy court in California.

16             THE COURT:  Exactly.  All right.

17        All right, Mr. Kelly.  Let's assume that we

18   operate under the assumption that I think what I ought

19   to do is transfer venue, but I am deeply concerned

20   about any malfeasance that happens in the interim.

21   How are you going to address my concern?  Because I

22   will be most unhappy if I find out any shenanigans are

23   going on in the interim.  So, how do we deal with

24   that?

25             MR. KELLY:  I would make the following

October 12, 2010

1    comments, which are, again, clear from the docket
2    sheets in the various cases.
3        When Mr. Ross initially got advice to file
4    bankruptcy, he had different counsel.  I'm not going
5    to say that counsel did anything wrong.  I am going to
6    say that we differ on what that advice should have
7    been.  And those counsel -- that counsel has been
8    changed.  Mr. McConnell is now counsel directly for
9    each of these estates.  He's a former federal
10   bankruptcy judge.  I think he's completely familiar
11   with the obligations and responsibilities of the
12   Debtor.  I can assure you--I'm representing Mr. Ross,
13   individually--we have had this talk.  He now fully
14   understands all of his duties and obligations.
15       So, I think he's been counseled and addressed
16   with counsel who are responsible, number one.
17       Number two, I would point out, no other party --
18   Remember, I go back to the state court case:  We want
19   a receiver, we want a TRO, we want to foreclose.  This
20   bank has required Mr. Ross to respond to pleadings
21   continuously for three months.  Every time he turns
22   around, he's been asked, and he keeps coming to Texas.
23   It's expensive, it's time-consuming.  It's very
24   difficult to run your business and operate with this
25   continual pressure.

1     Number three.  There are cash collateral orders
2  in every case which already restrict, seriously, the
3  use of funding.  "They," the bank, asked the court,
4  Judge King, not to allow this Debtor to use any money.
5   Those hearings were held.  Orders are entered.
6  There is a budget in each case that has a dollar.  The
7  Debtor is already under restrictive orders to fully
8  comply with those cash collateral orders, and they are
9  continuing.
10     Fourth.  On the discovery issue, there is an
11  initial document production due --
12     I believe it's October 15th?
13      -- which is a couple of weeks (sic).
14     Next, Mr. Ross --
15          THE COURT:  Actually, it's this week,
16  Friday.
17          MR. KELLY:  Sorry.  I apologize.  I did find
18  my way back to Austin.
19          THE COURT:  Okay.
20          MR. KELLY:  So, I'm competent to do a
21  little bit.  The -- And I did forget it was this week.
22  The --
23          THE COURT:  But we're going to comply with
24  that, aren't we?
25          MR. KELLY:  My understanding is, that will

1    be fully complied with.

2               THE COURT:  All right.

3               MR. KELLY:  Next, the Debtor, since all of

4    this stuff, has filed a Chapter 11 in California.  He

5    is under orders in California, 11 USC 363 obligations

6    with what he can do and not do with his interest in

7    property.  He is under requirement of that U.S.

8    Trustee to open a debtor-in-possession account, which

9    is why this bank account was closed.  And, so, right

10   this minute, I will tell you from what I've heard,

11   there is no clue on their part of any wrongdoing.

12   They say they don't know everything.  I will tell

13   you the testimony will unequivocally show you that

14   there is no funds of any of these estates that's been

15   used gambling, at all.

16        Further, even from their documents attached to

17   their current pleadings, there is no liability on

18   these estates.  They didn't guarantee any debt

19   gambling anywhere.  This estate, these estates have no

20   obligation.  And even on their pleadings, it's a note;

21   you go to the casino, you sign a note.  I would say

22   this.  I would imply that Caesar's doesn't normally

23   give a half-million-dollar line of credit to every guy

24   that walks in off the street.  Mr. Ross has been in

25   business many years.  He has -- If we go through the

October 12, 2010

Page 32

1  testimony, he has handled many transactions in this

2  state alone that are huge, that are big.

3      Since the hearings in Austin, we have signed

4  agreements to sell both hotel properties, that if

5  those close, will pay everybody in full, including

6  some unpaid wages in those cases.  We have other

7  property that's under contract for sale.  I actually

8  got a call from a client that I can't handle.

9          MR. RICHINS:  Your Honor?

10         THE COURT:  Hang on.

11     Yes?

12         MR. RICHINS:  Your Honor, Travis Richins for

13 National Guardian Life Insurance Company.

14         THE COURT:  You need to come up, counsel.

15         MR. KELLY:  They're -- Whether that's

16 objected to or not, I'm just stating the fact that we

17 have signed a contract to sell those properties.

18 National Guardian, this is counsel, they can respond.

19 They may or may not agree to it, they may or may not

20 agree to a sale, they may oppose it daily.  But we are

21 working on getting that property sold.

22         THE COURT:  All right, counsel.  I'll let

23 you address -- Do you want to address it now?

24         MR. RICHINS:  Okay.  I want to --

25         THE COURT:  And, for the record, you are?

Federal Court Reporters of San Antonio, Inc.
210-340-6464

1    MR. RICHINS:  Travis Richins, for National

2   Guardian Life Insurance Company.  We're a claimant

3   in Rossco Holdings, Inc.

4           THE COURT:  Okay.

5           MR. RICHINS:  I just wanted to make clear,

6   one fact is that the only reason that there has been

7   no request for a transfer in those two cases -- in the

8   LJR Properties and in the Rossco Plaza, Inc., case is

9   because the stay has been lifted in those cases and a

10  motion to dismiss will be entered in those cases.  And

11  we have no objection to the appointment of a trustee

12  at this time.

13          THE COURT:  All right.  Thank you.

14      Go ahead, Mr. Kelly.

15          MR. KELLY:  I would address any concern that

16  this counsel can give evidence on this stand today

17  that shows there's any issue that can't be resolved by

18  the court in California in a few weeks.  None have

19  been raised.  They just have this generic, he gambles.

20  It's not illegal.  They've failed to mention to you

21  that Mr. Ross, in his case, has a proposed net worth,

22  according to current appraisals, of $50 million.  This

23  is not a guy who's running these things into the

24  ground.

25          So, if they can show me a single concern, we will

1 address it specifically with language today.  But

2 between cash collateral orders, his Chapter 11, his

3 current debtor-in-possession account, and the rulings

4 and the budget already entered by this Court through

5 Judge King, I think we're covered.

6          THE COURT:  All right.  Mr. Atlee?

7      Counsel, did you wish to say something else?

8          MR. RICHINS:  Just --

9          THE COURT:  Come to the podium.  We won't --

10 We won't get it on the record if you don't come to the

11 podium, sir.

12          MR. RICHINS:  Just regarding his comment

13 that this is -- he has not been running properties

14 into the ground.  Both the LJR Properties, Limited --

15 I mean, LJR Properties, Limited, and the Rossco Plaza,

16 Inc., which is a Plaza Hotel, both of them are hotel

17 properties, were run into the ground.

18          THE COURT:  All right.  That's your

19 assertion.  All right.

20      Mr. Atlee?

21          MR. ATLEE:  Your Honor, we'll be happy to

22 put on evidence if Mr. Ross wants to testify.  Our

23 papers, I think, put a serious issue as to whether or

24 not, at the time that he signed a half million dollars

25 worth of markers at Caesar's Palace, he had money in

1   the accounts to cover those debts.  That is

2   potentially a Class D felony, under Nevada law.  It

3   certainly is a strong indication of --

4         THE COURT:  But that's -- Is that really my

5   concern?

6         MR. ATLEE:  Well, it is, because he is

7   the -- currently in charge of the Debtors.  If --

8   Their argument, taken to its extreme, would mean that

9   he can do whatever he wants, however fraudulent,

10  however dishonest, however egregious in his personal

11  conduct, and -- and still be the person who's allowed

12  to be in charge of the Debtors.  And the case --

13        THE COURT:  Well, I think Mr. Kelly's point

14  was, didn't Judge King -- didn't you all reach

15  agreements on use of cash collateral, and doesn't it

16  put the Debtors on a budget?  So, there should be some

17  limitation on the dissipation of money, shouldn't

18  there?

19        MR. ATLEE:  Well, your Honor, there -- even

20  under that regime, there are serious concerns.  Our

21  papers refer to the fact that in the petition for

22  Colony Lodging, for example, at the time that he

23  filed, he indicated there was more than $40,000 worth

24  of cash in a bank account.  The monthly operating

25  reports now show less than a thousand dollars.

1　There's been no explanation of where that money went.

2　And, again, we are operating in the dark here.  What

3　we do know is that, here's a man who appears to be out

4　of control in his personal behavior, at the same time

5　that we are not getting accurate information on the

6　petitions.

7　　　　I understand that he's run through a couple of

8　sets of counsel.  But it's been a month since

9　Mr. McConnell has been representing him, and we still

10　have the same petitions that were originally filed

11　that I think everybody would agree are -- are woefully

12　inaccurate.  And, so, what we need are, you know,

13　strict controls.

14　　　　If -- If the Court is not willing to start the

15　process of appointing the trustee today, then, in the

16　alternative, what we need is him to update his

17　schedules immediately.  He should sit --

18　　　　PHONE VOICE:  The host has disconnected.

19　The conference will now end.

20　　　　THE COURT:  Sorry about that.

21　　　　MR. ATLEE:  That's quite all right.

22　　　　THE COURT:  Go ahead, please.

23　　　　MR. ATLEE:  He should sit for an exam next

24　week to explain what the flow of money is from and

25　among all of the Debtors up to the trusts and to

1   himself.  We don't know where this money is coming
2   from, you know.  It's nice that he claims to have --
3           (Electronic/telephone noise.)
4           THE COURT:  I'm sorry.  Go ahead, please.
5           MR. ATLEE:  It's nice that he claims to have
6   a personal worth of $50 million, but from our
7   perspective, he -- he owes my client, you know,
8   something on the order of -- of 20 million.  And he
9   isn't reporting, he isn't telling us where the money
10  is, and -- and the behavior is -- is highly
11  concerning.
12      So, again, I would -- I would urge the Court to
13  attend to that serious problem today, rather than
14  allow this just to get deferred and, you know, kicked
15  down -- down the road so that the California court can
16  deal with it.
17          THE COURT:  All right.  Thank you.
18      Mr. McConnell, what about the issue of updating
19  the schedules?  Does that need to be done?
20          MR. McCONNELL:  Yes, your Honor.
21          THE COURT:  How soon?
22          MR. McCONNELL:  We have recognized that
23  problem from the beginning.  We've been spending the
24  last month since I've been involved in the case
25  responding to emergency motions for this, that, and

1  the other, by Pacific Mercantile, and, frankly, hadn't

2  gotten to it.  But we will.  I mean, it's -- it's

3  simply something --

4          THE COURT:  How soon will you get to it?

5          MR. McCONNELL:  Your Honor, we have a

6  document production from the Colony properties on

7  October the 15th.  We would commit to this Court to

8  have the schedules amended--we have gone over it with

9  the United States Trustee--three areas on each set of

10  schedules that need to be amended.  And we can do that

11  by the end of this month.

12          THE COURT:  Okay.  I assume you're not going

13  to agree to scheduling an exam next week, given Judge

14  King's prior ruling.

15          MR. McCONNELL:  No, your Honor.  We had

16  a lengthy hearing in San Antonio on our motion to

17  quash.  We made a specific proposal to Judge King on a

18  timetable that we thought that we could commit to with

19  respect to the Rule 2004 examination.  And I believe

20  Judge King's ruling was, I agree with the Debtor's

21  proposal and that's what my order will be.  And that,

22  you know, is the way that that played out.

23      Just one other brief comment, because I think

24  this Court's looking for a practical solution to the

25  accusations made by Pacific Mercantile.  First of all,

1   there are detailed budgets and cash collateral

2   agreements with respect to Colony and WM Properties,

3   the only properties that are really generating income

4   that is a concern of Pacific Mercantile.  Those orders

5   are in place today.  If they have some concept that

6   Mr. Ross is going to be riding across the horizon

7   taking money from the estates, obviously, he would be

8   violating those cash collateral orders, and he's got,

9   certainly, competent counsel to be supervising him.

10          Second, if that's a concern, we will commit to

11  hire a commercial property manager for the Colony,

12  which is the one property that -- out of the four that

13  they're talking about, that actually generates

14  significant income.  We'll use their cash collateral

15  to pay for that property manager.  And that property

16  manager can have a two-signature system on checks so

17  that not one dollar that is spent from the Colony

18  doesn't have the signature not only of Mr. Ross but of

19  the property manager.  That money's not going

20  anywhere.

21          With respect to WM Properties, there is a small

22  commercial building; it has one lease; it generates

23  about $4,000 a month in rent.  That makes a full

24  payment to Pacific Mercantile, and there's nothing

25  left after the payment of operating expenses.

1     So, it's a tempest in a teapot, your Honor.

2  There are more than sufficient controls in place right

3  now to maintain the status quo until these cases get

4  to California, and the California judge that they've

5  asked to hear these matters can hear the matters.  I

6  think there's a very practical solution here.

7              THE COURT:  All right.  Don't step away.

8        Yes, sir?

9              MR. RAWLINS:  I just wanted to ask.

10             MR. McCONNELL:  All right.

11             THE COURT:  Go ahead and yield the podium

12  for a minute, then I'm going to visit with you all.

13             MR. McCONNELL:  All right.

14             THE COURT:  Go ahead.  And you are, sir?

15             MR. RAWLINS:  Justin Rawlins, of Winston

16  Strawn, for Pacific Mercantile Bank.

17             THE COURT:  Okay.

18             MR. RAWLINS:  One of the things I think, as

19  far as the 2004 exam request, I think we should

20  clarify that.

21       We're concerned about having the 2004 exam, or

22  even just a limited exam on the gambling, and the use

23  of funds without -- with insufficient funds in the

24  bank accounts.  We still haven't received any

25  explanation as to why 500,000 checks -- dollars of

1  checks were written on an account that had $44 in it.
2  And that's a big problem for us.
3      Now, as far as the management of the estates,
4  yes, our biggest concerns are failure to pay property
5  taxes, other things that are bigger-picture issues
6  that aren't going to cause a huge problem in the next
7  week.  We'll probably get a hearing in front of Judge
8  Zurzolo next week.  But we'd like to have a 2004 exam
9  now.  We've asked Mr. Ross for an explanation as to,
10 where were the funds?  Where were the funds when you
11 gambled half a million dollars?  Where are the funds
12 when we have evidence of other gambling?
13     That's -- That's what we want to figure out now.
14 And I think that would actually be better to have this
15 week so we could avoid a hearing, potentially, on a
16 motion to -- a motion to appoint a trustee in the
17 individual -- in the individual case, and these cases,
18 when they're transferred, next week.
19     It's -- You know, as far as the -- the cash
20 collateral budget, yes, he's agreed to it.  And, yes,
21 if he violated it, that would be a major problem, and
22 we could take that up later.  So...
23         THE COURT:  All right.  Don't step away.
24     Mr. Kelly, Mr. McConnell, come on up here.
25 We'll have a little chat.  Do you want to address

1   that, Mr. Kelly?  And then I'd like to...

2          MR. KELLY:  Very briefly.

3      I don't want to say it's none of their business.

4   Okay?  What I do want to say is, Mr. Ross is in a

5   Chapter 11.  He has his own estate.  He has his own

6   counsel, and he's in California.  Why they've got to

7   know these specific issues today is beyond me.  If

8   they want to ask, was any money in these estates used,

9   we'll answer that question today.  If you want to ask

10  whether these estates have any liability, we'll answer

11  that today.  I'd like to know why he flew in from

12  California.  I'd like to know how many lawyers are

13  billing on this clock here, because I expect there's

14  going to be an objection to the reasonableness of fees

15  coming down the road.  We have three expensive lawyers

16  sitting here on this matter.

17         So, no, I don't want to do a 2004 this week.

18  He's already been here three times.  He's already had

19  these issues.  He's already under restrictions.  Who

20  cares?

21         THE COURT:  Now, the 2004, was it filed with

22  regard to the business entities or with regard to him,

23  individually?

24         MR. KELLY:  They were with regard to the

25  business entities, because that's all that's in

1  bankruptcy here.

2          THE COURT:  Right.

3          MR. KELLY:  He got divorced two years ago.

4  Do they want to talk about how well he handled his

5  marital estate?  Do they want to talk about how it was

6  divided?

7          THE COURT:  All right.

8          MR. KELLY:  Do you want to talk about

9  property that's not in bankruptcy?

10         UNIDENTIFIED SPEAKER:  Let's not get into

11 ridiculous --

12         MR. KELLY:  I am being -- You are being

13 ridiculous.

14         THE COURT:  All right, Mr. Kelly.

15 Mr. Kelly, I understand your point.

16     All right.  This is what we're going to do.

17 Believe it or not, I'd very much like to keep these

18 cases.  I really would.  A messy case does not concern

19 me in the least.  I specialize in those.

20     But what I'm going to do, it seems -- First of

21 all, I'm going to grant the motion to continue.  Given

22 the intervention, if you will, the filing of the

23 motion to transfer venue, which everyone's in

24 agreement with, and based upon the allegations that

25 are here on the motion to transfer venue as to why

1   this case should be in California, I fully agree it

2   ought to be in California.  So, I'm going to grant the

3   motion to continue.

4       I'm satisfied, based upon the arguments that have

5   been placed with the Court this morning regarding the

6   appointment of the trustee and the concerns regarding

7   the administration of the estate in the interim, that

8   that's not going to happen, given prior orders of the

9   Court that there's not going to be dissipation of

10  assets, there's not going to be malfeasance, there's

11  not going to be misappropriation, because I have two

12  gentlemen on the Debtor's side that certainly know

13  better than to allow that to happen.  So, I'm going to

14  grant the motion to continue.

15      The question I have first, gentlemen, is, I

16  assume that I still need to set this for hearing, the

17  motion to transfer venue, in the event that someone

18  opposes it.  So, that's my first question to you all,

19  or should I just transfer the case outright?

20          MR. RAWLINS:  Your Honor, we'd like the case

21  to be transferred outright so that we could move

22  forward in the individual case, rather than having a

23  lag period right now where we're prevented from doing

24  anything.

25          THE COURT:  All right.  Mr. Kelly?

1    MR. KELLY:  Your Honor, we would -- on

2  behalf of Mr. Ross, we would agree to that.

3      And I don't want to argue this further, but on

4  the 341 meeting, or on a Rule 2004 meeting, he has a

5  case in California; we're agreeing to transfer, then

6  go ask Judge Zurzolo.  He lives in California.  He

7  lives in Los Angeles, --

8            THE COURT:  Right.  If they're just --

9            MR. KELLY:  -- as this counsel does.  Let's

10  do it out there.

11            THE COURT:  If the issue -- If the issue

12  is he's done something wrongful, they haven't filed a

13  2004 in his case, yet, have they?

14            MR. KELLY:  No, sir.  Not that I'm aware of.

15            MR. RAWLINS:  I'm sorry to say, your Honor,

16  we've requested it and we've received no response to

17  the last time.

18            THE COURT:  All right.  So...

19            MR. KELLY:  We would -- On behalf of

20  Mr. Ross, I would concur in the Court entering an

21  order to transfer today.

22            THE COURT:  Mr. McConnell?

23            MR. McCONNELL:  Yes.  That'd be fine with

24  us.

25            THE COURT:  All right.  Seriously, I --

1    Yes, sir?

2         MR. RAWLINS:  I think this is clear, but

3    we just want to have abundantly clear on the record

4    that the two -- the Rossco Plaza, Inc., and the LJR

5    Properties, Limited, are not being transferred.

6         MR. McCONNELL:  We concur, your Honor.

7         THE COURT:  All right.  That's fine.

8    All right.  So, first of all, what I'm going to

9    do is, I'm going to -- I'm going to, in essence, grant

10   the motion to continue because I'm going to transfer

11   venue in these four cases, based upon the agreement

12   of the parties.

13   Second of all, I expect, as part and parcel of

14   this process, the document production will go forward

15   on the 15th, that updated schedules or amended

16   schedules, as to the four corporate Debtors, will be

17   filed no later than the end of the month, whatever day

18   that Friday is, let me see, which is the 29th, that

19   that will happen.

20   This is without prejudice to Pacific Mercantile

21   Bank seeking a 2004 exam in Mr. Ross's personal case.

22   Furthermore, if you all want to have an informal

23   discussion about what Mr. Ross did or did not do with

24   those monies as it relates to his gambling debts,

25   please, have that discussion and see what it -- see

October 12, 2010

1    what it accomplishes.  But...

2         Now, what about -- Mr. Atlee, what about the

3    suggestion, if you're concerned about as it relates to

4    Colony Lodging appointing a property manager?  Do you

5    want to do that, or not?

6              MR. ATLEE:  Your Honor, I think at this

7    point, if -- if the Court is inclined just to transfer

8    venue to California, we'll -- we'll simply leave it at

9    that for now.  I guess I would ask you, in terms of

10   timing, when does the Court anticipate entering that

11   order?

12             THE COURT:  I can enter that order today.

13             MR. ATLEE:  Thank you.

14             THE COURT:  Do I have a proposed form of

15   order that everyone can agree on?  Why don't you --

16   Why don't you -- I sign orders, seriously, with

17   lightning speed.

18             MR. ATLEE:  We'll get it to you today.

19             THE COURT:  So, it's not an issue for me.

20             MR. KELLY:  Your Honor, we will work with

21   the counsel before I leave today, and we'll get an

22   order.

23             THE COURT:  All I need is a representation

24   that the -- Mr. Kelly, Mr. McConnell and Mr. Atlee,

25   all I need is, you can just send an email to my

1  Courtroom Deputy, Ms. Lopez, that says you agree to

2  the -- to the form of the order.  I don't necessarily

3  need your signatures, but a representation either from

4  you, Mr. Atlee, or Mr. Rawlins, that the other parties

5  agree.  Those orders will get signed today.

6           MR. ATLEE:  Thank you.

7           THE COURT:  All right.  So, that's what I'm

8  going to do.

9       Mr. Ross, let me make this clear.  I'm not making

10 any findings, but you've got two very good lawyers

11 over here.  I don't need to tell you that.  I expect

12 everything to be done by the book, in the interim.

13 So, I expect that to be done.

14      So, the motion to continue is granted.  The Court

15 is going to transfer venue.  And you all -- The judge

16 in California, I'm sorry, the judge's name out there?

17          MR. ATLEE:  Zurzolo.

18          THE COURT:  Zurzolo.  Judge Zurzolo will

19 deal with the issue about whether or not to appoint a

20 trustee.  I don't make any finding as to whether or

21 not a trustee should be appointed.

22      Okay.  Anything else that we need to be -- that

23 we need to deal with right now, counsel?

24          MR. ATLEE:  I don't believe so.

25          THE COURT:  All right.  Let us know that the

1   form of order's acceptable, upload it, and it will get

2   signed today.  All right?

3              MR. ATLEE:  Thank you.

4              MR. KELLY:  I've just approved it, your

5   Honor.

6              THE COURT:  You have?

7              MR. KELLY:  Subject to the U.S. Trustee

8   (inaudible).

9              THE COURT:  All right.  Let's let --

10             MS. WENGER:  We have (inaudible).

11             THE COURT:  All right.  Fair enough, then.

12  What'll happen is, I'll sign it today.

13             MR. KELLY:  Do you want me to just hand it

14  to the courtroom staff, your Honor?

15             THE COURT:  Yes, you may.

16       All right.  We'll be in recess till 1:30.

17             MR. KELLY:  Thank you, your Honor.

18             (Recess.)

19                  ************

20

21       I, Court approved transcriber, certify that the
    foregoing is a correct transcript from the official
    electronic sound recording of the proceedings in the

22  above-entitled matter.

23  /s/ Rosemary Flores                November 9, 2010
    Signature of Approved Transcriber    Date

24

25  Rosemary Flores
    Typed or Printed Name